37270, 37295.   AETNA INSURANCE COMPANY *v.* WALKER *et al.;* and *vice versa.*

DECIDED OCTOBER 8, 1958—
REHEARING DENIED OCTOBER 24, 1958.

*Smith, Field, Doremus & Ringel, Sam F. Lowe, Jr.,* for plaintiff in error.

*Nall, Miller, Cadenhead & Dennis, William W. Griffin, Earl J. Van Gerpen,* contra.

QUILLIAN, Judge. ■ We will not designate the parties as plaintiff and defendants in error, but where it is necessary to distinguish them, they will be called the insurer and the insured.

A suit to recover for losses from risks covered by an insurance policy is a suit for breach of contract. To set forth a cause of action the petition must show the risk came within the general coverage of the contract, and must not disclose that it was excluded from the coverage of the policy by any clause contained in it.

Damage to the plaintiffs' house caused by "surface water" is a risk excluded from the coverage of the policy in this case. The policy is attached to the petition as an exhibit. Consequently, if the waters described in the petition as standing about the piers and foundation of the plaintiffs' dwelling house, and averred to have resulted in the damage to the house were surface waters, facts are not alleged upon which recovery may be had. Definitions of surface water come from text books and decisions of the courts of other jurisdiction.

"Surface waters are those which fall on the land from the skies or arise in springs and diffuse themselves over the surface of the ground, following no defined course or channel, and not gathering into or forming any more definite body of water than a mere bog or marsh." 93 C. J. S. 799, Waters, § 112.

"Surface waters consist of waters from rain, springs, or melting snow which lie or flow on the surface of the earth, but which do not form part of a well-defined body of water or natural water course. They do not lose their character as surface waters merely because in a measure they are absorbed by or soak into the marshy or boggy ground where collected." Enderson *v.* Kelehan, 226 Minn. 163, 167 (32 N. W. 2d 286).

" 'Surface water' is water which is derived from falling rain or melting snow, or which rises to the surface in springs, and is

diffused over the surface of the ground, while it remains in such diffused state, and which follows no defined course or channel, which does not gather into or form a natural body of water, and which is lost by evaporation, percolation, or natural drainage." Sun Underwriters Ins. Co. v. Bunkley, (Texas Civ. App.) 233 S. W. 2d 153 (2).

"Surface water is water of casual, vagrant character, oozing through the soil or diffusing and squandering over and under the surface, which, though usually and naturally flowing in known direction, has no banks or channel cut in the soil." Neal v. Ohio River R. Co., 47 W. Va. 316 (34 S. E. 914).

The Supreme Court of Georgia defines "surface water" as follows: "Thus it is material to consider whether the overflow as above stated is properly classed with surface water. This depends upon the configuration of the country and the relative position of the water after it has gone beyond the usual channel. If the flood water becomes severed from the main current, or leaves the stream never to return, and spreads out over the lower ground, it has become surface water. But if it forms a continuous body with the water flowing in the ordinary channel, or if it departs from such channel animo revertendi, presently to return, as by the recession of the waters, it is to be regarded as still a part of the river. The identity of a river does not depend upon the volume of water which may happen to flow down its course at any particular season. The authorities hold that a stream may be wholly dry at times without losing the character of a watercourse." O'Connell v. East Tenn., Va. & Ga. Ry. Co., 87 Ga. 246, 247 (13 S. E. 489, 13 L.R.A. 394, 27 Am. St. R. 246).

The Supreme Court held in Stoner v. Patten, 132 Ga. 178, 180 (63 S. E. 802): "An underground stream of water differs from a surface stream only with respect to its location above or below the surface."

The insured insists that the waters described in the petition do not come within the definitions of "surface waters" to which reference has been made. The insured's position is that they were subterranean or ground waters even after reaching the face of the earth, because, though it is not alleged in the petition,

they would eventually return to their normal water table below the surface of the earth.

As authority for this view he cites and quotes from the books written or compiled by eminent geologists. The works are Bulletin 65 of the Department of Mines, Mining and Geology of Georgia; The Availability and Use of Water in Georgia, by M. T. Thompson, S. M. Herrick, and Eugene Brown, published in December 1956. Applied Hydrology, by Ray K. Linsley, Jr., Max A. Kohler, and Joseph L. H. Paulhus, published in 1949 by McGraw Hill Book Company, Inc., is quoted as follows: "The water table, since its position is dependent on the continued accretion of ground water, fluctuates with annual variations in rainfall, being both lower and flatter after dry spells than after rainy periods. For various reasons the water table in some areas intersects the land surface, and springs or seeps result. Wet-weather seeps occur when a water table, raised by protracted rains cuts the land surface."

The insured concludes that because in these works spring waters and ground waters are discussed in the same chapter the geologists consider spring waters and ground waters of the same nature.

The holding of *Saddler* v. *Lee,* 66 *Ga.* 45 (42 Am. R. 62) makes it very clear that subterranean waters that find a water table above the surface of the earth must be classified either as bodies of water within well defined basins, streams flowing within their banks; or as surface water, and while upon the face of the earth lose their identity as "ground waters." Also refer to *Pelham Phosphate Co.* v. *Daniels,* 21 *Ga. App.* 547, 556 (94 S. E. 846). The books on geology to which the insured called attention simply explain the process by which subterranean waters penetrate the surface and form in basins or springs. Their presence either under the earth or upon the earth, in our opinion, impresses them with the nature and status of the place in which they are found, either subterranean or terranean. (The last word is used in its shade of meaning—"upon the earth," though it has another —"from the earth." Webster's New International Dictionary, 2d ed.). The word subterranean, being so well understood, needs no definition, but is defined by Words and Phrases, Vol.

40, page 532 as "The term 'subterranean waters,' as used in the Restatement of this subject [Restatement, Torts, § 845] comprehends waters which lie or flow under the surface of the earth and which are not artificially confined."

The waters described in the petition as standing around the foundations and piers of the insureds' house and from which damage to the same is alleged to have resulted, were not alleged to stand in the basins of the springs from which they emanated, or in any other body of water, or to belong to any definite stream of water, nor was there an averment that these waters would eventually return to any definite body or stream of water.

In this connection it is well to note that, while the petition related that the waters in question seeped from three subterranean springs, there is no allegation that, while standing about the piers and foundations of the house, they were retained in the natural basins of the springs or would return to those basins. The description of the waters as contained in the petition fits all the definitions given of surface waters by the great weight of authority and by our Georgia courts. Hence, the petition reveals that the damage to the insureds' house was caused by a risk against which the policy did not afford coverage.

■ The effect of holding that the petition sets forth no cause of action is to dispose of the whole case, hence we do not decide the question raised by the cross-bill as to whether coverage of an insurance policy for collapse extends to a collapse of a structure that has begun and in the order of nature must inevitably continue until it is complete.

*Judgment reversed on main bill of exceptions; cross-bill of exceptions dismissed. Felton, C. J., and Nichols, J., concur.*